UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
JOSEPH ANANIA, et al.,

                            Plaintiffs,

          -against-

UNITED STATES OF AMERICA, et al.,

                            Defendants.
--------------------------------------------------------------------X

**REPORT AND RECOMMENDATION**
CV 16-3542 (SJF) (ARL)

**LINDSAY, Magistrate Judge:**

      The plaintiffs, Joseph Anania, James Anning, William Buschmann, Michael Fisher, Nancy Haskell, Gerodette MacWhinnie, Keith Marran, Michael McPherson, Roland Michely, Gary Sacks, Roberta Terzo, Sara Widdicombe, Joseph Clinton, Mary Ellen Manning, Alison Amron, Juan F. Punchin, David Sahagian and Gregg Spangler (collectively, the "plaintiffs"), bring this action under 42 U.S.C. § 1983 ("Section 1983"), *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), 28 U.S.C. § 2201, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*   The plaintiffs assert that the defendants, the United States of America ("United States"), the United States Army Corps of Engineers (the "USACE"), Colonel David A. Caldwell (collectively, the "federal defendants") and the County of Suffolk (the "County"), violated their First, Fifth and Fourteenth Amendments rights in connection with the design and implementation of the Fire Island Inlet to Moriches Inlet Fire Island Stabilization Beach Restoration Project (the "FIMI Project").   The plaintiffs seek monetary damages as well as declaratory and injunctive relief.   Before the Court, on referral from District Judge Feuerstein, is the motion of the County for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 and the motion of the federal defendants to dismiss

the amended complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).    In the alternative, the federal defendants seek summary judgment.    For the reasons set forth below, the Court respectfully recommends that the defendants' motions be granted.

## BACKGROUND

### A.   Factual Background

### 1.   The Parties

The plaintiffs are waterfront owners of real property located in Cherry Grove, New York, an openly gay, lesbian, bisexual and transgender community in the Town of Brookhaven.    Am. Compl. ¶¶ 2, 3, 35.    Cherry Grove is bounded to the east by a section of the Fire Island National Seashore, which is operated and governed by the National Park Service.    *Id.* ¶ 40.    The United States is a sovereign nation existing pursuant to and operating under the Constitution and laws of the United States.    *Id.* ¶ 31.    The USACE is an agency of the United States existing and operating under the Department of the Army.    *Id.* ¶ 32.    Colonel Caldwell is Commander of the New York District of the USACE.    *Id.* ¶ 33.    The County is a New York municipal corporation duly organized and existing under the laws of the State of New York.    *Id.* ¶ 34.

### 2.   The FIMI Project

On October 29, 2012, Hurricane Sandy caused severe coastal erosion to a portion of the Long Island coastline that was already the subject of an ongoing study designed to address storm risk management needs along the south shore of Long Island (the "FIMP Reformation Study").    County's Rule 56.1 Statement ¶ 1; *see also* ECF No. 40-2, Ex. 3. (Fire Island Inlet to Moriches Inlet, Fire Island Stabilizing Project, Hurricane Sandy Limited Reevaluation Report ("HSLRR") at 1).    Following the hurricane, the USACE proposed stabilization measures that could proceed

2

independent of the FIMP Reformulation Study given the extent of damage to the dune and berm system on Fire Island and its vulnerability to over wash and breaching during storm events. County's Rule 56.1 Stmt. ¶ 4; *see also* HSLRR at Exec. Summ.    The resulting project, developed in accordance with the authority set forth in the Disaster Relief Appropriations Act of 2013, Public Law 113-2, is known as the "FIMI Project." *Id.*

The FIMI Project is a "one-time, stand-alone beach stabilization project" being undertaken by the USACE in cooperation with the State of New York and the County. County's Rule 56.1 Stmt. ¶ 5.    The FIMI Project was designed to provide Fire Island with a degree of storm damage protection through the placement of beachfill to reinforce the existing berm and dune system from the Fire Island Inlet to the Moriches Inlet.    *See* HSLRR at Exec. Summ.; Pls.' Rule 56.1 Counter-Stmt. ¶ 1.    The project area stretches from Robert Moses State Park in the west to Smith Point County Park in the east for a total of 19 miles.    *See* HSLRR at Exec. Summ.    The FIMI Project's stabilization efforts are focused on the Fire Island to Moriches Inlet since "this reach is the most populated and subject to barrier island over wash and breach." HSLRR at 65.    Indeed, the USACE has concluded that "[t]here is a more urgent need to advance the stabilization of this reach due to its vulnerability and potential for major damage and risk to life and property." *Id.*

In designing the scope of the FIMI Project, the USACE first surveyed the land to determine the beachfill volumes needed to achieve its goals.    *See* HSLRR at 66.    In doing so, consideration was given to the optimal beachfill alignment, the extent of beachfill needed and the impact of those items on real estate needs.    *Id.* at 65.    The USACE also sought to preserve as much as it could of the Post-Hurricane Sandy dune alignment, which had shifted landward during the storm.    *Id.*    However, the USACE weighed the cost of acquiring or relocating

3

oceanfront structures against the cost of increased beachfill needs. *Id.* In the end, the USACE determined that where no oceanfront structure existed, the most cost effective beachfill alignment was one that tied into the Post-Hurricane Sandy dune line and extended seaward from the existing shoreline only the distance necessary to achieve the required level of protection. *Id.* at 66. This chosen "alignment" or "dune line" is referred to as the "Updated Middle Alignment" or "MIDU," and it is positioned to the north of the original dune line that was known as the Minimum Real Estate Impacts ("MREI").[1] *Id.*

As compared to the other dune lines under consideration, the MIDU requires approximately 3 million cubic yards less beachfill. *Id.* at 66. Implementation of the proposed plan does, however, require "41 real estate acquisitions, 6 real estate relocations and over 600 "permanent easements."[2] *Id.* Nonetheless, by utilizing the MIDU

instead of the MREI, the reduced annual cost resulting from the reduction in initial fill volumes ($2.0 million per year) exceeds the additional expense of real estate acquisitions and relocations." *Id.* In addition, according to the USACE, "[t]his more landward alignment, is more sustainable and environmentally preferred." *Id.* Despite this analysis, the plaintiffs contend that there is no technical reason why the government chose to use the MIDU rather than a pre-Hurricane Sandy dune alignment. Pls.' Rule 56.1 Counter-Stmt. ¶22.

---

[1] Prior to Hurricane Sandy, the beachfill alignment, known as the Minimum Real Estate Impacts, was employed to minimize real estate costs." *Id.*

[2] Although the parties use the term "permanent easement," it is worth noting that the correct term is a "Perpetual Beach Storm Damage Reduction Easement." *See* HSLRR Real Estate Plan Appendix at 7, ECF No. 40-8. According to the Real Estate Plan Appendix, this easement empowers the Department of the Army and the State of New York, "its representatives, agents, contractors and assigns" to move/store/remove equipment and supplies, erect temporary structures, perform work "incident to the construction, periodic nourishment and maintenance of the [FIMP] Project,
including the [FIMI] Project," plant vegetation on the sand dunes and berms, erect, maintain and remove silt screens and sand fences, facilitate preservation of the dunes and vegetation through limitation of access to dune areas and remove debris and obstructions from the Easement Area. *Id.*

4

The selected plan also contemplates using three different design templates, namely, a "Berm Only," "Small," and "Medium" design. *See* HSLRR at 68. The "Berm Only" design is intended for areas where the existing dune elevation and width reduce the risk of breaching, but the areas have eroded beach berm conditions. *Id.* This design will be employed for Robert Moses State Park and Smith Point County Park. *Id.* The "Small" design template reduces the risk of breaching but is not designed to prevent a significant portion of the damage to oceanfront structures. *Id.* This "Small" design is contemplated for parts of the Robert Moses State Park, the Fire Island Lighthouse Tract, and the eastern section of Smith Point County Park. *Id.* The "Medium" design template has the highest net benefits. This design template contemplates a "berm width of 90 feet at an elevation at +9.5 feet NGVD (National Geodetic Vertical Datum), and a vegetated dune with a crest width of 25 feet horizontal and a foreshore slope of 12 feet horizontal for each 1 foot vertical. *Id.* at 67. It will be applied to the areas with the greatest potential for damages to oceanfront structures, particularly the 17 residential communities on Fire Island. *Id.* at 68.

Importantly, while the purpose of the FIMI Project is to "restore and augment the barrier island," the FIMI Project is a "stabilization plan." *See id.* Exec. Summ.; Anderson Aff. at ¶ 12. Indeed, the HSRLL makes clear that FIMI Project was never intended to completely restore the beaches and the dunes to pre-Hurricane Sandy conditions. *See* HSLRR at Exec. Summ. Nor does the HSRLL make allowance for the renourishment of the dune – it is a one-time, stand-alone action. *Id.* at 65. In fact, following the initial placement of sand, the project is expected to erode, and diminish in its protective capacity, eventually returning to a pre-project condition. *Id.* The FIMI Project is only expected to make a "measurable difference" for approximately 20 years. *Id.*

### 3. The Impact on Cherry Grove

Cherry Grove is one of the 17 communities included in the "Medium" design template, which contemplates a 25-foot wide dune crest and a 90-foot berm width. *Id.* at 68, Figure 12. Figure 12 in the HSLRR shows an example of a "Medium" beachfill section. *Id.* The heavy black line on Figure 12 shows the design fill template, and the dotted line below shows the Post-Sandy dune profile. *Id.* The area between the profile and the design fill template is where sand is to be added to bring the dune and the berm into conformance with the design template. *Id.* Figure 13 in the HSLRR illustrates the specific berm and dune placement for communities along the Great South Bay, including Cherry Grove. *Id.* at 71. According to Table 7 in the HSLRR, under the Medium design template, Cherry Grove was to receive an initial fill of 16,147 cubic yards of sand. *Id.* at 76, Table 7; *see* Boscamazo Decl. ¶16 (ECF No. 78-8).[3] However, the beachfill reserved for Cherry Grove is to be utilized to fortify its berm - widening it at elevation +9.5 [feet] NGVD [National Geodetic Vertical Datum], from 30 feet to 80 feet and raising its elevation from its present range of 4-8 feet to a uniform elevation of +9.5 feet NGVD. Boscamazo Decl. ¶ 16; Pls.' Rule 56.1 Counter-Stmt. ¶ 27. Unlike other communities, Cherry Grove is not slated to receive any beachfill for its dunes. Boscamazo Decl. ¶ 17; Pls' Rule 56.1 Counter-Stmt. ¶¶ 25-7.

In fact, as the plaintiffs highlight, the total amount of beachfill that Cherry Grove is slated to receive is far less than any of the other communities. HSLRR at 76; Pls' Rule 56.1 Counter-Stmt. ¶¶ 28-9. Indeed, Cherry Grove is not slated to receive any "advance fill" – a quantity of

---

[3] Lynn Boscamazo was the Chief of the Hurricane Sandy Relief Branch Engineering Division for the USACE. She submitted a declaration on August 12, 2016 in connection with the plaintiffs' order to show cause for a preliminary injunction. Her declaration was resubmitted in connection with this motion along with the affidavit of Gilbert Anderson, the Suffolk County Commissioner of Public Works. *See* ECF No. 78.

sand which acts as an erosional buffer against long-term and storm induced erosion.   *Id.*

The defendants do not dispute that Cherry Grove is expected to receive less beachfill than other communities.   They explain, however, that the fill volumes are only estimates as of the date the information was obtained.   County's Rule 56.1 Stmt. ¶ 36.   In this regard, they call attention to the fact that the HSLRR clearly states "[c]onstruction beachfill volumes required for the design condition will be based on project implementation surveys taken prior to the development of plans and specifications," and not the initial estimates.   HSLRR at 66.   More importantly, the defendants assert that the reason Cherry Grove is slated to receive less fill than other communities is because Cherry Grove already met the "Medium" design template specifications, that is, a vegetated dune with a crest width of 25 [feet] at an elevation of +15 NGVD." Boscamazo Decl. ¶ 17.   In other words, Cherry Grove, like every other community, was ensured a dune in compliance with the Medium design template.   It just happens that the Cherry Grove dune and berm system were in far better condition than the other communities.[4] Anderson Decl. ¶ 14; *see also* ECF No. 63 at 10.   The defendants contend that this is because Cherry Grove's property owners had contributed money towards a community dune restoration fund - a fund which was used to fortify and repair erosion of its primary and secondary dunes prior to Hurricane Sandy.   *Id.*

### 4.   The County's Role and its Public Outreach Efforts

Pursuant to 33 U.S.C § 2213, the USACE must have a non-federal sponsor, such as the State, to undertake the FIMI Project.   County's Rule 56.1 Stmt. ¶40; Am. Compl. ¶ 45.[5]   For

---

[4] The defendants note that Water Island, another Fire Island community, is not scheduled to receive replacement sand on any of its dunes because, like Cherry Grove, its dunes already meet the requirements of the Medium design template.   County's Rule 56.1 Stmt. ¶ 31.   The plaintiffs counter that Water Island is, nonetheless, receiving more cubic yards of sand for its berm.   Pls.' Rule 56.1 Counter-Stmt. ¶ 31.

[5] The undersigned takes this opportunity to note that although the plaintiffs have contested most of the facts set forth in the County's Rule 56.1 statement, in most instances, the plaintiffs' counterstatement simply supplements the facts

this reason, on August 25, 2014, the USACE entered into a Project Partnership Agreement with the State to implement the FIMI Project (the "PPA").   County's Rule 56.1 Stmt. ¶ 46.   The State, acting though the New York State Department of Environmental Conservation (the "NYSDEC"), then entered into a Local Project Partnership Agreement ("LPPA") with the County, pursuant to which, the County agreed to provide the property interest required for the construction of the FIMI Project.   *Id.* ¶ 42.

Notably, although the LPPA was not executed until 2014, in 2013, the County began to contact the affected Fire Island communities to obtain the communities input regarding the project.   *Id.* ¶ 43; *see also* ECF No. 40-15, Ex. 13, Testimony of Gilbert Anderson at 2/17/15 Public Hearing, 23-24.   In fact, meetings were held on October 29, 2013, July 24, 2014 and October 1, 2014, to address the public's concern for safety and aesthetics within the project area.[6] *Id.*   In addition, with respect to Cherry Grove, the County worked directly with the Fire Island Association ("FIA") and the Cherry Grove Community Association, Inc. ("CGCAI").   *Id.* ¶ 44; Anderson Aff. ¶ 17 (ECF No. 78-4).   For example, in March 2014, the USACE issued its draft HSLRR and Draft Environmental Assessment ("EA") for public comment.   *See* Anderson Aff. ¶ 10.   According to the County, it received "[o]verwhelming public support" for the FIMI project, including support from one of the plaintiffs, Gary Sacks.   *Id.*

On March 21, 2014, Diane Romano, President of the CGCAI, helped to get the word out by posting a March 18, 2014 email from Suzy Goldhirsch, President of the FIA, on the CGCAI's

---

rather than disputes them.   In other instances, such as this, the plaintiffs' counter is disingenuous.   For example, in this instance, the plaintiffs contest paragraph 40 in the County's Rule 56.1 Statement, which states "In order to undertake the FIMI Project, the Corps required a "Non-Federal Sponsor."   Paragraph 45 in the Amended Complaint similarly asserts "Federal Law (33 U.S.C. §2213) requires that, in order for the USACE to undertake a project such as the FIMI project, the USACE must have a Non-Federal Sponsor to participate in the project." Accordingly, the plaintiffs' "Contest" is far from appropriate.
[6]According to the facts set forth in Judge Feuerstein's 11/14/17 Memorandum and Order, the meetings were attended by a representative of the Cherry Grove community, John Adams.   ECF No. 63 at 13.

Facebook page:

> Good morning Cherry Grove,
>
> Please see the email below from Suzy Goldhirsch . . . concerning 2 important projects coming up for Fire Island.   The Army Corp of Engineers should hear from as many FI residents as possible on these projects.
>
> Please take a few minutes to read the documents and make your comments.
>
> *          *          *
>
> Dear all,
>
> The Draft Local Re-Evaluation Report for the . . . [FIMI] and the [EA] are now out for public comment, and accessible through the [USACE] Website.
>
> *          *          *
>
> Please urge as many of your residents as possible to comment before the April 2nd deadline.

*Id.* at Ex. A.   The posting from Suzy Goldhirsch provided a link to the relevant documents on the USACE website.   *Id.*   In June 2014, the USACE then released the Final HSLRR and EA. *Id.*   According to the County, no comments were received from any of the plaintiffs.   *Id.*

Shortly thereafter, the County advised CGCAI that no oceanfront homes in Cherry Grove were going to be acquired or moved back, but that some easements would be required.   *Id.* ¶ 17.   The defendants contend that Cherry Grove was also advised that despite the need for easements from oceanfront homeowners, no work was to be done on the Cherry Grove dune.   *Id.*   The plaintiffs insist that the posting they received indicated that "every Oceanfront homeowner [would] need to sign an easement that allows the Army Corp to place sand on *'the dune line'* since it will encroach on private property."   Pls.' Rule 56.1 Stmt. ¶ 44 (emphasis added).   They took this to mean that Cherry Grove would be receiving sand on its dune line.   *Id.*

Indeed, the posting to which the plaintiffs are referring is a post on the CGCAI Facebook page dated September 5, 2014.   That post states, in pertinent part:

> Good morning Cherry Grove,
>
> The [FIMI] Project is designed to provide coastal storm risk reduction and tidal inundation as a one time, stand alone project.   I am reviewing the real estate documents that will (once finished) be mailed to all oceanfront homeowners on Fire Island.   I will have them available at our September 21 membership meeting.   These documents basically effect our Oceanfront homeowners. Good news is . . . there are no Cherry Grove Oceanfront homes that need to be moved back . . . or even eliminated!!! But every Oceanfront homeowner will need to sign an easement that allows the [USACE] to place sand on the dune line since it (the sand) will encroach on private property.
>
> *       *       *
>
> We have been asked to compile a mailing list of the Oceanfront homeowners. We will send that to Suzy Goldhirsch . . . and she will forward the info to the County.

ECF No. 78-7.

The actual documents sent to the oceanfront property owners on September 12, 2014, provided a more thorough explanation of the purpose of the easements.

Specifically, the Real Estate Fact Sheet annexed to the County's letter stated:

> WHAT ARE EASEMENTS NEEDED FOR USACE TO CONSTRUCT AND MAINTAIN THE PROJECT
>
> 1.   <u>Process:</u>   The beach and dune template extend[] onto most privately owned ocean-front parcels along Fire Island.   A property owner will need to give permission to the County for USACE to place sand on their private property by signing an easement.   During the construction phase of the Project, the contractor may need to enter and/or cross over private land with equipment, material and labor for the purpose of building the beach and dunes. Adequate access to all relevant work areas is essential and must be secured for successful construction of the Project.
>
> WHAT ARE THE KEY PROVISIONS OF THE PERPETUAL EASEMENT?
>
> •       The Easement will specifically describe the portion of the property

10

where an engineered beach and dune system will be placed, i.e. the Easement Area.

*       *       *

•     The Easement is only for the placement of sand, dunes, vegetation and fencing on private property and specifically states that it will allow the County, DEC, USACE and their representatives, agents contractors and assigns "to construct, preserve, patrol, operate, maintain, repair, rehabilitate, and replace a public beach, and other erosion control and storm damage reduction measures together with appurtenances thereto, including the right to deposit sand, to accomplish any alterations of the contours on said land, to construct berms and dunes, and to nourish and re-nourish periodically.

Anderson Aff. ¶ 18; ECF No. 78-7.  In addition, the Real Estate Fact Sheet included several flowcharts illustrating the process for different types of property interests to be acquired as well as samples of two types of easement agreements.  *Id.*  Finally, the Fact Sheet indicated that surveyors would need access to each person's property to precisely identify the project's footprint and summarized the key provisions of the easement.  *Id.*

On October 2, 2014, the County issued a Second Real Estate Fact Sheet in response to questions that were generated by the initial Real Estate Fact Sheet and placed it on the County's FIMI website.  Anderson Aff. at ¶ 20; ECF No. 78-7.  The second fact sheet addressed questions about how and when the new dune line (the MIDU) was determined, and why it wasn't straight.  *Id.*  Specifically, the fact provides the following:

How was the dune line determined? Why Isn't straight? When was the dune alignment finally determined?

•     An engineered beach and dune system provide [] coastal protection based on engineering calculations following extensive study by USACE.  These calculations establish the appropriate width and slope of beaches and the size and location of dunes to protect the shoreline.  USACE also weighed the costs and benefits of placing the dune line further south or north and determined the line that provided the best benefit for the cost.

11

> The alignment is not straight as it follows the natural contour of
> the land to match the existing topography.   The final dune
> alignment was determined when the Final Report for the Project
> was approved by the Corps in July 2014.

Who was the voice of the homeowners when the dune line was set?

- The Fire Island Association, the Towns and the County were all involved in the dune alignment discussions for the past year.

ECF No. 78-7.   The Second Fact Sheet also advised homeowners that "sand would only be placed up to the design elevations." *Id.*   In other words, "if [at the time the final design was completed] there was already sand at the design elevation, then no sand w[ould] be placed on that dune."[7]  *Id.*   Finally, the Second Fact Sheet advised residents that there was "no one map that shows the entire Project," but that the dune layout could be found in Appendix C of the Final HSLRR Main Report" on the website.   *Id*.

At that time, the County also addressed questions raised by residents concerning the term "perpetual easements."   *Id;* County's Rule 56.1 Stmt. ¶ 54.   Specifically, they advised residents that the easement is termed "perpetual" because if the FIMI Project remains authorized by Congress, the non-federal sponsors must maintain the ability to access the project area to perform inspections and maintenance to ensure the continued benefit from the project.   *Id.*   The County further pointed out that perpetual beach easement will also allow USACE to restore the dunes should another severe storm event occur.[8]   *Id.*   The plaintiffs do not dispute the specific

---

[7] The plaintiffs read the Second Fact Sheet quite differently.   They contend that the comment "no sand would be placed" was limited to an event where sand would accumulate or accrete as a result of sand bags and fencing.   Pls.' Rule 56.1 Counter-Stmt. ¶ 51.   The plaintiffs are correct that the answer was provided in response to the following question: "If sand has accreted above the dune design elevation due to the trap bags and sand fencing that exists now, will the Corps still add more sand on the dune?"   ECF No. 78-7.   However, the response is broader.   It says: "If the existing area has accreted above or to the design elevation at the time that the final design is completed [for any reason], then no sand will be placed on that dune." *Id.*

[8] The easements will remain in full force and effect while the FIMI Project remains authorized by Congress; however, should Congress ever de-authorize the Project, landowners will be able to request the release of the perpetual easements on their property.   *See* Anderson Aff. ¶ 22.

information set forth on the Second Fact Sheet.   Nonetheless, they counter that the promise of future relief (i.e. additional sand) was a misleading inducement to yield an unconstitutional taking.   Pls.' Rule 56.1 Counter-Stmt. ¶ 54.

In December 2014 and February 2015, the County held public hearings, in accordance with the Eminent Domain Procedure Law ("EDPL"), to "consider the acquisition of, among other things, the easements over the plaintiffs' properties." County's Rule 56.1 Stmt. ¶ 57.   The County sent notices for both hearings to owners of the plaintiffs' properties.[9] *Id.*   The notices specified that "those property owners who may subsequently wish to challenge the condemnation of their property via judicial review, may do so only on the basis of issues, facts, and objections raised at the hearing or in any written testimony that is timely sent and received."   *Id.* ¶ 58.   In addition, the CGCAI posted an e-mail from the FIA president on its Facebook page advising homeowners of the February public hearing, its time and location.   *Id*. ¶ 59.

Although the plaintiffs acknowledge that the CGCAI posted notice of the hearing on their Facebook page, the plaintiffs contend that the posting by their community leaders urged homeowners to support the FIMI project.   Pls.' Rule 56.1 Counter-Stmt. ¶ 59.   The plaintiffs also argue that "[a]s late as November and December 2015, . . . the County was still providing contradictory and uncertain information to the plaintiffs about the scope of the project and the easements as they applied (or not) in Cherry Grove."   Pls.' Mem. at 8.   Accordingly, while the plaintiffs do not deny receipt of the hearing notices, they do argue that the notices failed to adequately advise them that they were being asked to provide the County with an easement over their properties even though no work was going to be performed on their community's dune.   *Id.* ¶ 58.   As such, the plaintiffs imply that they did not appear at the hearings because they did not

---

[9] An Affidavit of Mailing is annexed to the Affidavit of Anderson.

understand that they were being forced to provide the defendants with an easement to aid in the construction of an improved Fire Island berm and dune system when they had nothing to personally gain from the project.  *Id.*

Nonetheless, during the hearings, the County did make 16 Abstract Request Maps available for examination.   ECF No. 40-16 (sheets 8, 9 and 16 showing Cherry Grove).   The County also introduced a set of proposed acquisition maps for each parcel illustrating the specific acquisition area, that is, the extent of the easement required, and the "Landward Limit of Fill," which is the northernmost area to which sand would be added*." ECF No. 40-17.   That Landward Limit of Fill line corresponds to the northern boundary of the 'Acquisition Area' shown on the acquisition maps for the individual properties.   The Acquisition Areas are the area over which the County sought easements.   *Id.*   The plaintiffs state that they understood the Acquisition Area to be the area of the proposed constructed dune.   Pls.' Rule 56.1 Counter-Stmt. ¶ 63.

Following the February 2015 hearing, the hearing record was left open for a period of thirty days and all comments received at the hearings and during the thirty-day comment periods were considered.   County's Rule 56.1 Stmt. ¶ 64.   None of the plaintiffs submitted comments. *Id.* at ¶ 66.   Again, the plaintiffs contend this is because they did not know they would not be receiving any beachfill on their dune.   Pls.' Rule 56.1 Counter-Stmt. ¶ 66.   However, on February 23, 2015, three weeks before the close of the hearing record, the CGCAI posted the following message on its Facebook page, which certainly reflects that accurate information was being transmitted about the status of the Cherry Grove dune:

> Good afternoon Cherry Grove,
>
> Some photos that were distributed at the last FIMI meeting were posted on Facebook and did create quite a few questions.   Joshua David and I had a

phone call with Suzy Goldhirsch to try to get some clarification around this issue.   Joshua took copious notes and did some further research.   Below are his findings.   As always, it there are further questions, we will attempt to get answers.   Best, Diane

Dear Cherry Grove Community,

Because there have been some confusing Facebook postings about the status of the [FIMI] Project and how it might effect beachfront property owners in Cherry Grove, we've done a little research and want to offer a few clarifications.

Please take this as an attempt to shine light on what can be a complex and confusing process - - but affected property owners should not rely solely on this information.   Any questions about how FIMI and the easements will effect beachfront property owners can be answered by representative of the project team who will be contacting each homeowner in the next few weeks to explain the process.   In addition [,] we advise that it is always best to consult your attorney.

That said, some clarifications:

*There will be no sand added to the dunes in Cherry Grove during this project. Our dunes (thanks to the amazing work of the Dune Fund and our entire community) are already at the height at which they are replenishing dunes elsewhere on Fire Island, so no sand will be added to our dunes.   Sand will, however, be added to our beach lower down, below the dune line, to fortify the beach itself.*

Even though our dunes will not receive sand as part of this project, beachfront owners will be asked by Suffolk County to sign an easement . . . to allow the Army Corps to rebuild the dune if they are significantly damaged in a future storm.

*          *          *

Signing the easement will not effect the square footage actually owned by beachfront property owners.   You still own the land, you have simply given over the right to the government to possibly supplement the dune there at some future point.

Anderson Aff. at Ex. M (ECF No. 78-7) (emphasis added).

Subsequently, the County issued its Determination and Findings, in which the hearing

officer concluded that the real estate acquisitions (including perpetual easements) were necessary

15

to construct the FIMI Project in a manner that will provide the greatest protection to the barrier beach, especially in the residential areas that are the most susceptible to flood damage. County's Rule 56.1 Stmt. ¶ 67; Anderson Aff. ¶ 34.   The Determinations and Findings addressed all objections raised at the hearing or in subsequent written testimony.   County's Rule 56.1 Stmt. ¶ 67.   The County also published a Notice of Synopsis of Determination and Findings (the "Synopsis"), summarizing the findings and determinations of the hearing examiner and served the Synopsis on all potentially impacted property owners, including the plaintiffs. ECF No. 40-19.   Under EDPL §207, the property owners had 30 days following the publication of the Determination and Findings to seek judicial review of the Determination and Findings in an original proceeding in the Appellate Division.   County's Rule 56.1 Stmt. ¶ 68.   The plaintiffs did not do so.

Nevertheless, the plaintiffs note that even after the public hearing process was completed, the County continued to communicate with representatives from Cherry Grove about the easements.   *Id.* ¶ 68.   For example, between July 2015 and November 30, 2015, the plaintiff, Michael Fisher ("Fisher") and his counsel, frequently communicated with Deputy County Attorney Gail Lois ("Lois") about the "unique status" of Cherry Grove residents.[10]   *Id.* ¶ 69; Pls.' Rule 56.1 Counter-Stmt. ¶ 68; *see also* Hill Decl. Ex. 1-12.   In fact, in August 13, 2015, Lois agreed to communicate Cherry Grove's concerns to the USACE and see if they would exclude Cherry Grove from the FIMI Project since it only contemplated adding to the berm in Cherry Grove.   *See e.g.,* Hill Decl. Ex. 3.   Another issue of concern that lingered following the hearings was the language used in the easements with respect to the ability of the homeowners to

---

[10] According to the plaintiffs, Fisher was concerned that the easement would prevent him from repairing, maintaining and restoring certain buildings on his property.   Pls.' Mem. at 9.

16

rebuild in the event of casualty.[11]   County's Rule 56.1 Stmt. ¶ 70.   The County worked with the USACE and was able to obtain clarification of the easement language with respect to the ability to rebuild.   *Id.*   The plaintiffs were not, however, able to get the County to "equitably [modify the easements] to conform to the reality of the project, i.e., that no work was to be performed on their properties." *See* Pls.' Rule 56.1 Counter-Stmt. ¶ 70

### B.    Procedural History

Accordingly, on June 27, 2016, the plaintiffs commenced this lawsuit.   The plaintiffs allege, among other things, that the Cherry Grove oceanfront property owners have been denied equal protection and due process in violation of the Fifth and Fourteenth Amendment to the Constitution.   They also claim that they have a genuine fear that the easements being imposed upon them will impact their freedom of association, freedom of speech and expression, and right to privacy in violation of the First Amendment.   They argue, in this regard, that they are members of a segment of society that has been historically discriminated against through acts of government repression and regulation of conduct.   In addition, the plaintiffs seek a declaration that (1) the FIMI Project, as applied to Cherry Grove, has no public purpose or use to justify the prejudicial taking of their property and (2) the eminent domain proceedings failed to satisfy the notice requirements of the New York Eminent Domain Procedure Law.   They also seek to set aside the findings and conclusions of the County with respect to the FIMI Project as arbitrary and capricious pursuant to the Administrative Procedure Act.

The day after they filed the complaint, the plaintiffs filed a motion for a preliminary injunction.   After the motion was fully briefed, but before it was decided, the plaintiffs amended

---

[11]  The plaintiffs highlight the fact that in August 2015, Lois advised Fisher that is would not be beneficial to attend a meeting with the USACE.   Pls.' Mem. at 10.   However, it is important to note that those discussions took place after the County had completed its Final Determination and Findings.

their complaint.   ECF No. 29.   On January 30, 2017 and February 21, 2017, the County and the federal defendants filed their respective answers to the amended pleading.   However, shortly thereafter, the County filed a motion for judgment on the pleadings.   On October 23, 2017, the federal defendants followed suit and filed their motion to dismiss.   Both motions were referred to the undersigned.

Two weeks later, the District Court issued its decision on the plaintiffs' motion for a preliminary injunction finding that the plaintiffs had failed to establish that they would suffer irreparable harm.   ECF No. 63.   The plaintiffs had claimed that they would suffer diminished peaceful enjoyment as well as reduced marketability because of the easements.   Judge Feuerstein found that record lacked "sufficient factual evidence that absent a preliminary injunction [the plaintiffs would ever], much less immediately, suffer if such preliminary relief is not granted prior to the Court being able to pass upon the merits of this case at trial.   *Id.* at 30.

In the meantime, the undersigned had begun to review the defendants' motion papers and, on December 11, 2017, issued a report recommending that the motions be converted into motions for summary judgment given the enormity of the record and the repeated references to documents outside the four corners of the complaint.   ECF No. 64.   On January 12, 2018, District Judge Feuerstein adopted the recommendations and directed the parties to resubmit the motion to the undersigned.   However, in doing so, she ruled that the federal defendants' motions to dismiss Counts I through III pursuant to Rule 12(b)(1) should not be converted.[12]   ECF No. 63.

---

[12] With respect to Count IV, which seeks judicial review under the Administrative Procedure Act, the District Court noted that it was academic whether the motion was decided under Rule 12 or Rule 56 because review of the challenged agency action is confined to the administrative record which presents a legal question.   ECF No. 63.

### C.    The Parties' Contentions

In sum, the plaintiffs contend that their constitutional rights are being trampled upon by virtue of the fact that they have "been uniquely left out of the ongoing dune restoration project." They claim that Cherry Grove is the only community within the FIMI Project boundaries whose primary dune is not being restored or reconstructed.    They also contend that there is no rational basis for the omission of Cherry Grove from the implementation of the design template given the fact that their beach is equally in need of repair.    Moreover, the plaintiffs argue that the easements contain numerous provisions that exceed any requirement rationally related to the planned activities of the defendants on the Cherry Grove beach.    In other words, why should they be required to give the defendants an easement if no work is being done on their properties.

The plaintiffs also contend that the easements will substantially interfere with their constitutionally protected rights of assembly and privacy, particularly considering Cherry Grove's character as an openly gay, lesbian and transgender community.    To this end, the plaintiffs claim that the defendants will use the easements to regulate, repress, prohibit, censure, and chill them from engaging in the personal, expressive, social and communal activities typically associated with gay, lesbian and transgender individuals and communities and gay culture in general.    Am. Compl. ¶ 72.    Finally, the plaintiffs contend that the Notice of Synopsis of Determination and Findings published by the County was inadequate and misleading in that it failed to disclose that Cherry Grove was being uniquely excluded from the benefits of the FIMI Project.    *Id.* ¶ 11.

The County contends that when the defendants determined the amount of sand to be added to the dunes and berms, the defendants applied the same criteria to Cherry Grove as was applied to all other communities on Fire Island.    They further argue that the plaintiffs' statement

19

that "Cherry Grove is being excluded from the dune restoration portion of the project" is wholly inaccurate.   Cherry Grove, they say, simply requires less fill than other communities because its dune and berm system happen to be in better shape.   They also note that Cherry Grove will receive other benefits, including "construction of a berm, planting of vegetation on the dunes and construction of crossovers, to the extent crossovers may be necessary, protection of the dunes by prohibition of grading of or construction on the dunes, and implementation of a dune monitoring, maintenance and repair program." County's Mem. at 2.   In fact, in the future, should additional surveys conducted reveal that Cherry Grove's dune no longer satisfies the Medium design template, sand will be added.   *Id.* at 2-3.   As such, the County suggests that the plaintiffs' true gripe is not based on any shortcomings in the defendants' analysis; but is instead based on their disappointment that the USACE chose an alignment that will not restore the beach to its pre-Hurricane Sandy condition.   Finally, the County argues that none of the plaintiffs spoke at the hearings, submitted written comments or sought judicial review following the publication of the Determination and Findings, and therefore, are barred by their failure to exhaust administrative remedies.

The federal defendants contend that to the extent the plaintiffs seek money damages for the alleged violations of their Equal Protection, Due Process and First Amendment rights, those claims against the USACE and the United States are barred by the doctrine of sovereign immunity.   The federal defendants further argue that the claims asserted against Colonel Caldwell must be dismissed because the amended complaint but does not contain a single allegation of any individual action, let alone unconstitutional one, by him.   Finally, the federal defendants assert that the USACE is entitled to summary judgment with respect to the plaintiffs claim seeking review under the Administrative Procedure Act because, as the County noted,

Cherry Grove has not been "excluded" from the FIMI Project.

## DISCUSSION

### A.     Standards of Law

#### 1.     Rule 12(b)(1)

The defendants have moved to dismiss the complaint under both Rule 12(b)(1) and Rule 56.   "'When a defendant moves to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, and also moves to dismiss on other grounds, . . . the Court must consider the Rule 12(b)(1) motion first.'" *Craig x. Saxon Mortg. Servs., Inc.*, No. 13-CV-4526, 2015 WL 171234, at *4 (E.D.N.Y. Jan. 13, 2015) (quoting *Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 703 (S.D.N.Y. 2011)).   "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).   "[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)(citations and internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010).   In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court may consider relevant documents that are extrinsic to the complaint.   *See id.*

#### 2.     Rule 56

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'   A fact is material if it 'might affect the outcome of the suit

under the governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).   In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion."  *Cronin v. Aetna Life Ins. Co*., 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962) (*per curiam)); see Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (same).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).   The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.  *Matsushita,* 475 U.S. at 586.   Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case."  *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).   However, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.   "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Gallo*, 22 F.3d at 1224.

### B.     Sovereign Immunity

The federal defendants have moved to dismiss Counts I (Equal Protection), II (Due Process) and III (First Amendment) as against the USACE, the United States and Col. Caldwell

in his official capacity arguing that this Court lacks subject matter jurisdiction to consider actions

for monetary damages against the United States unless sovereign immunity has been waived.[13]

Each of the counts seeks damages in amounts to be determined at trial. *Id.* at ¶¶ 80, 92 and 97.

      "It is well-established that the United States is immune from suit unless it consents to be

sued." *Foster v. FEMA*, 128 F. Supp. 3d 717, 724 (E.D.N.Y. 2015) (citing *United States v.*

*Dalm*, 494 U.S. 596, 608 (1990)).   "This immunity extends to federal agencies and officers

acting in their official capacities." *Id.* (citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) and

*Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005)).   In this case, neither the United States, the

USACE or its officers have waived sovereign immunity from claims for money damages for

alleged Constitutional violations.   *See Crockett v. Mayor of D.C.*, 561 Fed. Appx. 3, 4 (D.C. Cir.

2014) ("Because sovereign immunity shields the Federal Government from suits for money

damages based on alleged constitutional violations, those claims were properly dismissed")

(citing *Benoit v. U.S. Dep't of Agric.,* 608 F.3d 17, 20 (D.C. Cir. 2010) ("[S]uits for damages

against the United States under. . . the Constitution are barred by sovereign immunity")).

Moreover, the United States and its agencies have not waived sovereign immunity from claims

brought under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403

U.S. 388 (1971), 28 U.S.C. § 2201.   *See Gault v. Soc. Sec. Administration*, 2017 WL 1655192,

at *2 (E.D.N.Y. May 2, 2017) (Chen, J.) ("A Bivens claim against a federal agency [and] against

the United States are barred under the doctrine of sovereign immunity") (citations omitted).

Finally, neither the United States nor its agencies have waived sovereign immunity under § 1983,

which only applies to individuals alleged to have acted under color of state law.   *See Chen v.*

*United States*, 2011 WL 2039433, at *10 (E.D.N.Y. May 24, 2011) (Ross, J.) (dismissing claims

---

[13]  The plaintiffs have not specified if Col. Caldwell was intended to be named in his individual or official capacity.

against the United States and BOP because "[a]ctions brought pursuant to 42 U.S.C. § 1983 are only available against state actors"), aff'd, 494 Fed. Appx. 108 (2d Cir. 2012). Accordingly, the undersigned respectfully recommends that Counts I, II and III be dismissed as against the United States, the USACE and Col. Caldwell to the extent the plaintiffs intended to sue him in his official capacity.[14]

### C.    The Plaintiffs' 1983 Claims as Against the County

The plaintiffs have asserted the same three constitutional claims against the County pursuant to 42 U.S.C. § 1983. To maintain an action under Section 1983, the plaintiffs must allege two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiffs suffered a denial of their federal statutory rights, or their constitutional rights or privileges. *See Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). The Court will address each of the 1983 claims in turn.

### 1.    Equal Protection

As noted above, Count I alleges that the defendants violated the Equal Protection clause of the United States Constitution because they required, or will require, the plaintiffs to give perpetual easements over their oceanfront properties although their properties have allegedly been excluded from the dune restoration portion of the FIMI project. *See* Am. Compl. ¶¶ 74-80.

---

[14] Although the balance of the federal defendants' arguments with respect to Col. Caldwell are not jurisdictional, the Court takes this opportunity to find that Counts I through III must also be dismissed as against Col. Caldwell to the extent the plaintiffs intended to name him in his individual capacity. Other than identifying Col. Caldwell as the Commander of the New York District USACE responsible for the execution of the FIMI project, the plaintiffs do not assert a single allegation concerning his personal involvement in the alleged Constitutional violations. They simply state that as the commanding officer of the District, Col. Caldwell should have corrected the unconstitutional practices being carried out by other individual employees and officers of the USACE. *See Cangemi v. United States*, No. 12-CV-3989 (JS) (SIL), 2016 WL 915173, at *8 (E.D.N.Y. Mar. 7, 2016 (dismissing *Bivens* claim because the complaint lacked any allegations that Col. Boule was personally involved in any constitutional deprivation). Accordingly, the Court respectfully recommends that Counts I to III also be dismissed as against Col. Caldwell individually.

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. 5.    Traditionally, claims brought under the Equal Protection clause involve discrimination against people based on their membership in a vulnerable class.    *See Lavoie-Francisco v. Town of Coventry,* 581 F. Supp. 2d 304, 309–10 (D. Conn. 2008), aff'd, 352 F. App'x 464 (2d Cir. 2009) (citing *Goldfarb v. Town of West Hartford*, 474 F. Supp. 2d 356, 366 (D. Conn. 2007) (internal quotation marks omitted)).    In this case, the plaintiffs have not expressly stated the basis of the alleged discrimination.    However, the rhetoric in the complaint and the inuendo in their motion papers certainly implies that they believe they have been "singled out" based on their sexual orientation.    Nonetheless, in response to the County's motion, the plaintiffs have provided legal argument based on a "class of one theory" and dropped a footnote suggesting that additional discovery may have uncovered the true intent of the public officials to discriminate against them.

The undersigned has reviewed hundreds of pages of documentation surrounding the FIMI Project, including the defendants' Findings and Conclusions regarding the Cherry Grove dune, and has not found a shred of evidence to suggest that the plaintiffs are receiving less sand because they live in a an openly gay, lesbian, bisexual and transgender community.    Moreover, if the plaintiffs wanted to pursue the claim based on sexual orientation, the plaintiffs had to assert something more specific than the fact that the LGBT community has long been the target of hostile and over-reaching government regulation.    Accordingly, for the purpose of this motion, the plaintiffs are being treated as a class of "waterfront property owners located in the historic community of Cherry Grove, New York." Am. Compl. ¶ 2.

"[Courts] have long recognized that the equal protection guarantee . . . extends to

individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *See Mateo v. Dawn*, No. 14-CV-2620 (KMK), 2016 WL 5478431, at *4 (S.D.N.Y. Sept. 28, 2016); *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).   A class-of-one claim arises when a plaintiff claims that he or she was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000).   In order to succeed on a "class-of-one" claim, the plaintiffs must establish that: "(i) no rational person could regard the circumstances of the plaintiffs to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Mateo*, 2016 WL 5478431, at *4–5.   To this end, "[c]lass-of-one plaintiffs must show "an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Id.* (quoting *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (internal quotation marks omitted)).   In fact, "[b]ecause of the particular posture of a 'class of one' claim, the comparator's circumstances must be 'prima facie identical.'" *Id.* (quoting *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011)).

The plaintiffs have not adequately alleged a class-of-one equal protection claim because they cannot point to a group of "identical" property owners in Fire Island who are being treated differently.   In this case, the plaintiffs contend that based solely upon the fact that they reside Cherry Grove, they are being deprived of a critical protective measure, namely, the benefit of a reconstructed dune.   *See* Am. Compl. ¶¶ 2, 6-7, 43-44, 56.   The plaintiffs also maintain that

they are being required to convey perpetual easements without any rational basis since no work is being performed near their properties.   *See id.* ¶¶ 5, 58-9.   The flaw in the plaintiffs' argument lies in the fact that they are attempting to rely on a broad class of comparators, that is, all waterfront property owners on Fire Island.   *See* Am. Compl. ¶ 75.   Although the plaintiffs live in a community that also suffered severe erosion and damage because of Hurricane Sandy, the plaintiffs are different from this broad class of comparators in that their properties are in a community that already met the Medium design template.[15]

Moreover, while the plaintiffs assert that "the FIMI Project" has arbitrarily gerrymandered the dune line in such a manner to exclude Cherry Grove," it is clear from the HSRLL report that the "MIDU" was chosen based on, among other things, economic factors and that the Medium design template is being uniformly applied across all 17 communities in Fire Island.   *See* HSLRR at 65-6.   It is also clear from the record that the dune line oscillates because it follows the natural contour of the land to match the existing topography.   ECF No. 78-7.

The plaintiffs' contention that they are being required to convey "perpetual easements" although they are not receiving the same protection as other property owners is also untenable. To begin with, although the dune in Cherry Grove has not been slated for repair, the plaintiffs are receiving a benefit from the overall FIMI Project.   According to the HSLRR, Cherry Grove is expected to receive 16,147 cubic yards of sand to restore its berm system.   HSLRR at 76.   In addition, while Cherry Grove characterizes potential future benefits as a "hollow promise," Cherry Grove is expected to receive the "construction of a berm" and may receive planting of

---

[15]Notably, Water Island appears to be the only community that is a close comparator in that it also meets the Medium Design Template.   However, like Cherry Grove, Water Island is not currently scheduled to receive additional sand on its dune.   *See* Ciorra Decl. ¶ 13.

vegetation on the dunes, construction of crossovers, dune protection by prohibition of grading of or construction on the dunes, and implementation of a dune monitoring, maintenance and repair program.   County's Mem. at 2.   Moreover, should additional surveys conducted reveal that Cherry Grove's dune no longer satisfies the Medium design template, the defendants have indicated that sand will be added to the dune.   *Id.* 2-3.

Significantly, the FIMI Project designed to provide all of Fire Island with a degree of storm damage protection.   *See* Casolaro Decl. Ex. 3.   Indeed, it is believed that the "project will provide hurricane and coastal storm risk management for homes and businesses within the floodplain extending along 83-miles of ocean and bay coastline."   *Id.* at Ex. 6.   In other words, the FIMI Project should provide a benefit to all Fire Island homeowners as well as the heavily populated mainland located near the Fire Island barrier.   Moreover, nothing in the record suggests that the plaintiffs are being "singled out" with respect to the easements.   In fact, it is clear from the documents attached to the HSLRR that the easements are being required for "property along all areas where beachfill material is placed, or *could potentially be placed*, during construction and renourishment operations, to allow continual access to construct, operate, maintain, control, repair, re-nourish, and replace the beach berm and dune." *See* HSLRR Real Estate Plan Appendix.

While the plaintiffs clearly feel that is unjust to require them to provide easements if work is not being performed in front of their homes, the plaintiffs must "point to at least one other individual whose circumstances, aside from being treated more favorably than plaintiff are 'prima facie identical' in all other respects," and they have not done so.   *See MB v. Islip Sch. Dist.*, No. 14-CV-4670 SJF GRB, 2015 WL 3756875, at *9 (E.D.N.Y. June 16, 2015); *Weissmann v. Vill. of Sloatsburg*, 667 F. App'x 345, 346 (2d Cir. 2016) ("The District Court

28

correctly concluded that plaintiffs-appellants failed to adduce sufficient evidence of a comparator to sustain a class-of-one equal-protection claim.") (summary order).   Accordingly, the Court respectfully recommends that the plaintiffs' equal protection claim against the County be dismissed.

### 2.    Due Process and the Notice Requirements of the New York Eminent Domain Procedure Law

As previously stated, Count II asserts that the defendants have violated the Fourteenth Amendment Due Process Clause by failing to notify the plaintiffs that Cherry Grove was to be excluded from the dune restoration portion of the FIMI project.   *Id.* at ¶¶ 81-92.   They claim, in this regard, that because the County's notice left out "critical information," the plaintiffs were deprived of the opportunity to object at the eminent domain hearings or to challenge the finding of public purpose in the Final Determinations and Findings.   Count V similarly seeks a declaration that the eminent domain proceedings conducted by the defendants failed to satisfy the notice requirements of the New York Eminent Domain Procedure Law, and thus, will be addressed at this time.

"In order to assert a violation of procedural due process rights, a plaintiff must 'first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was [a]ffected without due process.'" *Jones v. County of Suffolk*, 236 F. Supp. 3d 688, 694 (E.D.N.Y. Feb. 21, 2017) (quoting *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL–CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994)). "Thus, a claimed violation of procedural due process involves a two-step analysis: (1) the court examines whether the [government] deprived plaintiff of a constitutionally protected interest, and (2) if so, the court determines whether the procedures surrounding that deprivation were

29

constitutionally adequate."   *Id.* (citing *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004)).

The parties do not dispute that the plaintiffs have a protected interest in their oceanfront properties.   Nor do the plaintiffs appear to challenge the means of providing the notice to oceanfront property owners.   The plaintiffs do, however, challenge the content of that notice. Specifically, they say that "[a]t no point during [the eminent domain] proceedings—neither before, after or during the public hearings, nor anywhere within the written Determinations and Findings or the Synopsis of same, did the Defendants provide any notice to Cherry Grove residents . . . as to the critical fact that Cherry Grove was being excluded from the dune restoration portion FIMI project and the beneficial aspects thereof—i.e., protection of property . . . ." Am. Compl. ¶ 87.   In fact, they say, a reasonable takeaway from the information that was being disseminated by the defendants was that "if an easement [was] being required, a dune [was] being built."   Pls.' Mem. at 31.

The record in this case paints a different picture.   To begin with, as previously stated, the plaintiffs have not been "excluded from the FIMI Project." Cherry Grove is one of the 17 communities included in the "Medium" design template.   *See* HSLRR at 68, Figure 12.   The record also suggests that far from concealing information, the County took pains to accurately describe the FIMI Project throughout the proceedings and to provide property owners with a chance to raise concerns and time to object.   Indeed, the County began meeting with Fire Island residents as early as October 29, 2013 and continued holding informational meetings and reaching out to property owners through the fall of 2014.   At the first meeting in October, residents in attendance, including a Cherry Grove representative, were already advised that "perpetual" easements were needed from all oceanfront properties.   Both the drafts of the HSLRR and EA and the final versions issued in June showed the location of the MIDU line and

30

the dune and berm locations.   In addition, the public documents listed the affected properties and indicated the beachfill volumes contemplated for each community.   The HSLRR also clearly stated that "[c]onstruction beachfill volumes required for the design condition [would be] based on project implementation surveys taken prior to the development of plans and specifications ("pre-implementation surveys")."   HSLRR at 66.   Accordingly, the HSLRR certainly contained documents suggesting that Cherry Grove was among the communities that would be getting both a dune and berm, the HSLRR never guaranteed that sand would be added to the dune or berm in any of those communities unless the pre-implementation surveys indicated that the community failed to satisfy the Medium design template.

After the final HSLRR was issued, the County took additional steps to educate the public. For example, a meeting was held on July 24, 2014, with the FIA, at which the County made a Power Point presentation about the FIMI Project.   Information from the defendants was also disseminated through community leaders.   In fact, as early as March 2014, the CGCAI's Facebook contained a posting advising Cherry Grove residents that the Draft Local Re-Evaluation Report and the EA were out for public comment and accessible through the USACE website.   Anderson Aff. ¶ 10.   Shortly thereafter, the CGCAI advised residents that no oceanfront homes in Cherry Grove were going to be acquired or moved back, but that easements from all oceanfront homeowners would be required to enable the USACE to place sand on the Fire Island dune line.   *Id*. ¶ 17.   Following that posting, the actual documents were then sent to all the oceanfront property owners and included a further explanation of the scope of the FIMI Project and the purpose of the easements.   Specifically, the Real Estate Fact Sheet sent to residents explained that during the construction phase of the Project, the contractor might need to enter and/or cross over private land with equipment, material and labor for the purpose of

building the beach and dunes.   ECF No. 78-7.

In October 2014, the County issued a Second Real Estate Fact Sheet to answer, among other things, questions about the dune line alignment.   *Id*.   The Second Real Estate Fact Sheet made clear that the USACE had weighed the costs and benefits of placing the dune line further south or north and determined the MIDU line that provided the best benefit for the cost.   *Id*. The Second Real Estate Fact Sheet also explained that the alignment was not straight because it follows the natural contour of the land to match the existing topography.   *Id*.   Importantly, the Second Real Estate Fact Sheet further stated that "sand would only be placed up to the design elevations." *Id*.   In other words, "if there was already sand at the design elevation, then no sand w[ould] be placed on that dune."   *Id*.   At that time, the County also addressed questions raised by residents concerning the term "perpetual easements." *Id*.   Property owners were clearly advised that the easement was termed "perpetual" because if the FIMI Project remains authorized by Congress, the non-federal sponsors must maintain the ability to access the project area to perform inspections and maintenance and to allow the USACE to restore the dunes should another severe storm event occur.   *Id*.

Notwithstanding the information disseminated through the fact sheets, the plaintiffs still argue that they did not receive adequate notice because "no one, including the government . . . had a firm grasp on what the FIMI meant for Cherry Grove."   However, at least one post on the CGCAI Facebook page suggests otherwise.[16]   Indeed, on February 23, 2015, three weeks before

---

[16]   The plaintiffs contend that the "patchwork assemblage of inadmissible communications . . . do not reflect . . . constructive notice . . . . Pls.' Mem at 9.   It is important to note that the screenshots of the CGCAI Facebook page documents are reliable not for the truth of the matter addressed therein but simply to establish that the statements did occur and were published.   *Shafii v. PLC British Airways*, 22 F.3d 59, 65 (2d Cir. 1994) ('The statements are not offered for the truth of the matter asserted but for the fact that they had occurred.").

the close of the hearing record, the president of the CGCAI posted a letter from Joshua David

that set forth his understanding as to why Cherry Grove was not slated for dune restoration:

> There will be no sand added to the dunes in Cherry Grove during this project. Our dunes (thanks to the amazing work of the Dune Fund and our entire community) are already at the height at which they are replenishing dunes elsewhere on Fire Island, so no sand will be added to our dunes.   Sand will, however, be added to our beach lower down, below the dune line, to fortify the beach itself.

He also noted that "[e]ven though [the Cherry Grove] dunes will not receive sand as

part of this project, beachfront owners will be asked by Suffolk County to sign an

easement . . . to allow the Army Corps to rebuild the dune if they are significantly

damaged in a future storm." Anderson Aff. at Ex. M (ECF No. 78-7) (emphasis added).

Although the plaintiffs counter that they were not all subscribers to the CGCAI

Facebook page and did not consult "the Facebook page for informational purposes," see

Pls.' Mem. at 26, the posting is certainly reflective of type of information that was being

disseminated to residents who attended the meetings and communicated with officials.

The Second Circuit has held that the content of a notice in a condemnation

proceeding "must be 'reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action.'" *Brody v. Vill. of Port Chester*, 434

F.3d 121, 130 (2d Cir. 2005) (citing *Mullane v. Cent. Hanover Bank & Tr. Co*., 339

U.S. 306, 314–15, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950)).   In other words, "the

notice must be of such nature as reasonably to convey the required information" and

"it must afford a reasonable time for those interested to make their appearance."

*Mullane,* 339 U.S. at 314–15.   In this case, the undersigned finds that the notice

provided to the plaintiffs adequately described the FIMI Project, the potential impact on

33

the plaintiffs' properties and afforded them a reasonable time for those interested to make their appearance.   Accordingly, the undersigned finds that the procedures used by the defendants satisfied due process.

For the same reasons, the Court also finds that the defendants acted in accordance with the notice provisions of the Eminent Domain Procedure Law.   Prior to a taking, a condemnor must conduct a public hearing "in order to inform the public and to review the public use to be served by a proposed public project and the impact on the environment and residents of the locality where such project will be constructed[.]" EDPL § 201.   Following the public hearing, the condemnor must then make a determination and findings specifying the public use, benefit or purpose to be served by the proposed project; the approximate location of the proposed public project and the reasons for the selection of that location; the general effect of the proposed project on the environment and residents of the locality; and such other factors as the condemnor deems relevant.   EDPL § 204(B).   Thereafter, the condemnor must publish a brief synopsis of its determination and findings and anyone aggrieved by the findings and determination may obtain judicial review thereof.   *See Ciszewski v. New York*, No. 05-CV-0167, 2007 WL 121123, at *1 (N.D.N.Y. Jan. 10, 2007), aff'd, 279 F. App'x 39 (2d Cir. 2008) (citing EDPL §§ 204(A), 201.   It is well settled, however, that "[a] condemnor need not describe every detail of the project or the area to be condemned" as long as it "adequately describe[s] the project in both the notice and determination." *See Smithline v. Town of Harrison*, 131 A.D.3d 1173, 1174-75 (2d Dep't 2015).

There is nothing in the record to suggest that the County failed to comply with the notice requirements of the New York Eminent Domain Procedure Law.   The

34

defendants conducted a public hearing that adequately described the scope of the project, made a determination and findings, published a synopsis of those findings and provided the plaintiffs with an opportunity to object or seek judicial review. Accordingly, the undersigned recommends that the plaintiffs' due process claim as well as its request for a declaration that the eminent domain proceedings conducted by the defendants failed to satisfy the notice requirements of the New York Eminent Domain Procedure Law be dismissed.

### 3.    First Amendment

Finally, there is no evidence that the easements will infringe on the right to free association, free expression and privacy.   *See id.* at ¶¶ 93-97 (Count III).   Unquestionably, the plaintiffs have "a protected right to express themselves through association" on Cherry Grove. *Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007).   Indeed, "[i]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S. Ct. 3244, 82 L.Ed.2d 462 (1984)).   However, the plaintiffs have offered no evidence that the defendants' actions have or will burden their right to free association or expression.   *See Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (plaintiff required to show that the defendant's actions had some actual, non-speculative chilling effect).   Moreover, to the extent the ongoing FIMI Project may impact the plaintiffs' right to privacy, "mere incidental burdens . . . do not violate the First Amendment; rather, '[t]o be cognizable, the interference with [plaintiffs'] . . . rights must be 'direct and substantial' or 'significant.'" *Tabbaa*, 509 F.3d at 101 (*citing Fighting Finest, Inc.* v. Bratton, 95 F.3d 224, 228 (2d Cir. 1996)).   Here, the plaintiffs allege that the

easements carry with them the power to "patrol" the easement area, and thus, they fear that that power will be used by the County to censure the LGBT community.   This naked assertion of a chill does not suffice.   Accordingly, the undersigned recommends that Count III of the plaintiffs' amended complaint be dismissed.

### D.    The Administrative Procedure Act ("APA") Claim

In Count IV, the plaintiffs seek to set aside the findings and conclusions of the FIMI Project as it applies to them and Cherry Grove.   Am. Compl. ¶ 118.   The plaintiffs argue that "the FIMI [P]roject is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* ¶ 117.   The plaintiffs also assert that the USACE has "excluded the community of Cherry Grove" from the protections afforded by the FIMI Project.   *Id.* ¶ 116.   For many of the reasons previously stated, the record does not support their APA claim.

"Where, as here, 'a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal,' and '[t]he entire case on review is a question of law.'" *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015).   Indeed, "'[t]he question of whether an agency's decision is arbitrary and capricious . . . is a legal issue amenable to summary disposition.'" *Id.*   In this case, the plaintiffs accuse the USACE of running afoul of the APA prohibition on arbitrary and capricious agency rulemaking when it decided to implement the "Medium design template" with the Updated Middle Alignment which ultimately resulted in a determination that Cherry Grove's dune did not require restoration.   They argue, in this regard, that the defendants should have considered "net volume [sand] loss" rather than utilizing the MIDU measurement.   Byrnes Decl. at ¶ 6.   Indeed, the plaintiffs contend that Cherry Grove on average had a higher "net volume loss" than other communities. *Id*. at Table 1.

Although the plaintiffs clearly disagree with the defendants' methodology and final

determination, far from being irrational or arbitrary, it appears that the USACE carefully weighed its options before determining the scope of the FIMI Project. For example, the record indicates that the USACE first surveyed the land to determine the beachfill volumes needed to achieve its goals. See HSLRR at 66. At the time, consideration was given to the optimal beachfill alignment, the extent of beachfill needed and the impact of those items on real estate needs. *Id*. at 65. The USACE also sought to preserve as much as it could of the Post-Hurricane Sandy dune alignment, which had shifted landward during the storm. *Id*. In the end, the USACE determined that the most cost effective beachfill alignment was one that tied into the Post-Hurricane Sandy dune line. While the plaintiffs may firmly believe that the USACE should have restored the Fire Island beaches to their pre-Hurricane Sandy conditions, the USACE's decision, based in part on the cost of the restoration, was not arbitrary.

Similarly, although the plaintiffs strongly believe that sand should have been allocated based on the net volume of sand lost in the storm, there is nothing in the record to suggest the decision to use a Medium Design Template was arbitrary or capricious. In fact, the HSLRR suggests that the "Medium Design Template" had the highest net benefits for the 17 residential communities on Fire Island. *Id*. at 67-8. That template contemplates a "berm width of 90 feet at an elevation at +9.5 feet NGVD (National Geodetic Vertical Datum), and a vegetated dune with a crest width of 25 feet horizontal and a foreshore slope of 12 feet horizontal for each 1 foot vertical. *Id*. at 67. Moreover, the plaintiffs' conclusion that Cherry Grove has been arbitrarily excluded from the FIMI Project is simply wrong. Cherry Grove is receiving sand to shore up its berm and may receive beachfill in the future if the dune fails to meet the Medium design standards following a severe storm. *See* HSLRR 98, 100; *see also* 33 U.S.C. §701n(a)(1) ("[t]here is authorized an emergency fund to be expended . . . in the repair and restoration of any

federally authorized hurricane or shore protective structure or project damaged or destroyed by wind, wave, or water action of other than an ordinary nature to the design level of protection . . . "). In addition, according to the HSLRR, communities located in the Medium design template, including Chery Grove, will be receiving dune plantings to develop protective vegetation. Accordingly, the Court finds that the USACE obtained all the available and necessary information for the rendering of its decision and satisfied its responsibility under the APA. *See Dibble v. Fenimore*, 488 F. Supp. 2d 149, 154 (N.D.N.Y. 2006), aff'd, 545 F.3d 208 (2d Cir. 2008)("A decision is arbitrary and capricious under the A.P.A. if the agency 'relied on factors [that] Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.'")(*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).

Moreover, even if the evidence supported a finding that the decisions made by the defendants were arbitrary, the plaintiffs did not exhaust their administrative remedies, and thus, are barred from asserting the APA claim. Under the EDPL, an aggrieved person may seek judicial review of the condemnor's determination and findings within thirty days of their publication. EDPL § 207(A). The aggrieved person may sue only in the Appellate Division of New York Supreme Court and only in the Department of the Appellate Division that embraces the county in which the property at issue is located. *Id.* Judicial review is based on the record of the Section 201 hearing and the Section 204 determination and findings. *Id.* Here, following the February 2015 hearing, the hearing record was left open for a period of thirty days and all comments received at the hearings and during the thirty-day comment periods were considered." County's Rule 56.1 Stmt. ¶ 64. Although the plaintiffs contend they did not

challenge the determination because they did not know they would not be receiving any beachfill on their dune, the fact remains that none of the plaintiffs spoke at the hearing or submitted comments.   Id. at ¶ 66.   Nor did any of the plaintiffs seek judicial review within the thirty-day time period.   Accordingly, even if their APA claim was viable, the claim would have been barred for failure to exhaust.   Accordingly, the undersigned recommends that Count VI be dismissed.

### E.    "No Public Purpose"

Count IV of the amended complaint seeks a declaration that "[t]he FIMI project, as applied to the Cherry Grove community and the properties of the Plaintiffs . . . is without a public purpose or use so as to justify the prejudicial taking of Plaintiffs' property and property rights."   Am. Compl. ¶ 99.   The plaintiffs argue, in this regard, that in the absence of dune construction in Cherry Grove, the easements being forced upon them is arbitrary and capricious, discriminatory, without a rational basis, and thus, constitutes an excess taking.   For all the reasons previously stated, the undersigned recommends that Count IV also be dismissed.[17]

### CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that the defendants' motions be granted in their entirety.

### OBJECTIONS

A copy of this Report and Recommendation is being electronically filed on the date below.   Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 14 days of service.   Failure to file

---

[17] Given the Court's determination, the plaintiffs' request for injunctive relief must be denied.

objections within this period waives the right to appeal the District Court's Order.   *See* 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997);

*Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated:   Central Islip, New York
         March 21, 2019

_____/s/_____
ARLENE R. LINDSAY
United States Magistrate Judge